1

2

3

4

5

6                            IN THE UNITED STATES DISTRICT COURT

7                         FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   JEFF ANDERSON, BRET ADEE, DAVID
     HACKENBERG, LUCAS CRISWELL, GAIL
11   FULLER, CENTER FOR FOOD SAFETY,                     No. C 16-00068 WHA
     AMERICAN BIRD CONSERVANCY, PESTICIDE
12   ACTION NETWORK NORTH AMERICA, and
     POLLINATOR STEWARDSHIP COUNCIL,
13
                Plaintiffs,
14                                                       **ORDER GRANTING
        v.                                               DEFENDANTS' MOTION
15                                                       FOR SUMMARY
     GINA MCCARTHY and ENVIRONMENTAL                     JUDGMENT, DENYING
16   PROTECTION AGENCY,                                  AS MOOT DEFENDANT-
                                                         INTERVENORS' MOTION
17              Defendants,                              FOR SUMMARY
                                                         JUDGMENT, AND DENYING
18      and                                              PLAINTIFFS' MOTION FOR
                                                         SUMMARY JUDGMENT**
19   CROPLIFE AMERICA, AMERICAN SEED TRADE
     ASSOCIATION, AGRICULTURAL RETAILERS
20   ASSOCIATION, AMERICAN SOYBEAN
     ASSOCIATION, NATIONAL COTTON COUNCIL
21   OF AMERICA, NATIONAL ASSOCIATION OF
     WHEAT GROWERS, and NATIONAL CORN
22   GROWERS ASSOCIATION,

23              Defendant-Intervenors.
                                                    /
24

25                                      **INTRODUCTION**

26          In this challenge to federal agency action, all parties move for summary judgment.

27   For the reasons discussed below, the agency's motion is **GRANTED**, defendant-intervenors'

28   motion is **DENIED AS MOOT**, and plaintiffs' motion is **DENIED**.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**STATEMENT**

Plaintiffs are beekeepers, farmers, and organizations concerned about the effect of pesticide-treated seeds on bees and other pollinators.  They brought this action to challenge the alleged failure of the Environmental Protection Agency and its Administrator, Gina McCarthy, to enforce the Federal Insecticide, Fungicide, and Rodenticide Act with respect to such seeds.  According to plaintiffs, many seeds planted in the United States are coated with neonicotinoids, a type of pesticide that distributes throughout the resultant plant and thus kills insects both by direct contact and via the plants they ingest.  Additionally, these seeds, when planted, can release pesticidal "dust-off" that further spreads neonicotinoids beyond the seeds themselves (Dkt. No. 90-1 at 4).  Thus, plaintiffs allege, the practice of coating seeds with neonicotinoids has had a systematic and catastrophic impact on bees and the beekeeping industry throughout the United States (*id.* at 1).

Under FIFRA, pesticides must be registered with the EPA prior to use.  7 U.S.C. 136a. The Administrator, however, may exempt from registration requirements "any pesticide which the Administrator determines either (1) to be adequately regulated by another Federal agency, or (2) to be of a character which is unnecessary to be subject to this subchapter in order to carry out the purposes of this subchapter."  7 U.S.C. 136w(b).  In 1988, pursuant to this authority, the EPA created an exemption from FIFRA registration requirements for "articles or substances . . . treated with, or containing, a pesticide to protect the article or substance itself . . . if the pesticide is registered for such use."  40 C.F.R. 152.25(a).

In 2003, in a publication titled "Harmonization of Regulation of Pesticide Seed Treatment in Canada and the United States" (Dkt. No. 88-3), the EPA clarified the 1988 "treated articles or substances" exemption applied to "pesticide-treated seeds" as long as the pesticide is registered for such use under FIFRA and "the pesticidal protection imparted to the treated seed does not extend beyond the seed itself to offer pesticidal benefits or value attributable to the treated seed."  Subject to those two conditions, "[s]eeds for planting which are treated with pesticides registered in the U.S. are exempt from registration as pesticides" (*id.* at 1–2).

United States District Court
For the Northern District of California

In 2013, the EPA issued to FIFRA compliance and enforcement managers a document titled "Guidance for Inspecting Alleged Cases of Pesticide-Related Bee Incidents."  The cover memorandum stated, "This guidance is a supplement to the [FIFRA] Inspection Manual . . . I request that you distribute this guidance to your state lead agencies and tribal pesticide programs and encourage you to discuss implementation of this guidance with them."  A disclaimer at the beginning of the document cautioned (Dkt. No. 88-2):

> This guidance represents EPA's recommended procedures for [FIFRA] inspectors when they are conducting FIFRA inspections as a result of an incident involving bee deaths.  This guidance is not a regulation and, therefore, does not add, eliminate or change any existing regulatory requirements.  The statements in this document are intended solely as guidance.  This document is not intended, nor can it be relied on, to create any rights enforceable by any party in litigation with the United States.  EPA, state and tribal officials may decide to follow the guidance provided in this document, or to act at variance with the guidance, based on analysis of site-specific circumstances.

The focal point of our lawsuit is a single passage within the guidance itself, which stated (*id.* at 7–8 & n.17):

> Note:  Treated seed (and any resulting dust-off from treated seed) may be exempted from registration under FIFRA [pursuant to 40 C.F.R. 152.25(a)] as a treated article and as such its planting is not considered a "pesticide use."  However, if the inspector suspects or has reason to believe a treated seed is subject to registration (*i.e.*, the seed is not in compliance with the treated article exemption), plantings of that treated seed may nonetheless be investigated.

Plaintiffs filed this lawsuit in 2016, claiming the 2013 Guidance is reviewable under the Administrative Procedure Act.  Their complaint asserted four claims for relief.  The first, third, and fourth claims for relief asserted that the 2013 Guidance exceeded the EPA's statutory authority, failed to comply with the APA's rulemaking requirements, and was arbitrary and capricious (Dkt. No. 1 at 22–29).  The second claim for relief asserted that the EPA's "non-enforcement policy" regarding neonicotinoid-coated seeds, as embodied in the 2013 Guidance, was an unlawful "abdication" of its responsibilities under FIFRA (*id.* at 25–26).

The EPA moved to dismiss for lack of subject-matter jurisdiction (Dkt. No. 21) and several trade organizations that would be affected by the outcome of this case moved to intervene (Dkt. No. 26).  A previous order granted the motion to intervene and denied the EPA's

1   motion to dismiss, finding that "the factual dispute between the parties — whether the 2013

2   Guidance constituted final agency action — is 'so intertwined' with the merits that a

3   'jurisdictional finding of genuinely disputed facts is inappropriate.'"   The order acknowledged

4   the EPA "put forth a strong argument in support of dismissal of the lawsuit at the Rule 12 stage"

5   but noted that, in our circuit, "essentially all environmental cases concerning subject-matter

6   jurisdiction are decided only after reviewing the administrative record, typically at the summary

7   judgment stage" (Dkt. No. 62 at 4–6).

8        The EPA now moves for summary judgment on plaintiffs' first, third, and fourth claims

9   for relief on the basis that the 2013 Guidance was not a reviewable final agency action, and on

10   plaintiffs' second claim for relief on the basis that plaintiffs have failed to identify any

11   nondiscretionary action that has been unlawfully withheld (Dkt. No. 88).   Defendant-intervenors

12   join in the motion and separately move for summary judgment on the basis that plaintiffs'

13   lawsuit constitutes an improper programmatic challenge to the EPA's regulation of pesticides

14   (Dkt. No. 89).   Plaintiffs also move for summary judgment on their first, third, and fourth claims

15   for relief on the basis that the 2013 Guidance was a reviewable final agency action, and on

16   their second claim for relief on the basis that the EPA's policy of non-enforcement as to

17   neonicotinoid-coated seeds is an unlawful "abdication" of its responsibilities under FIFRA

18   subject to judicial review (Dkt. No. 90-1).

19                                          **ANALYSIS**

20        **1.    LEGAL STANDARD.**

21        Summary judgment is appropriate when there is no genuine issue of material fact and the

22   moving party is entitled to judgment as a matter of law.   F.R.C.P. 56(a); *Conservation Congress*

23   *v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014).   When a court reviews a government agency's

24   action, however, the standard for summary judgment is amplified by the APA, which provides

25   the applicable standard of review.   *Finley*, *supra*, at 617; *Good Samaritan Hosp., Corvallis v.*

26   *Matthews*, 609 F.2d 949, 951 (9th Cir. 1979).   The APA requires the reviewing court to "decide

27   all relevant questions of law, interpret constitutional and statutory provisions, and determine the

28   meaning or applicability of the terms of an agency action."   The reviewing court shall "compel

United States District Court

For the Northern District of California

agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. 706(1)–(2). Thus, in considering motions for summary judgment, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985).

### 2. NATURE OF PLAINTIFFS' CLAIMS.

As a preliminary matter, this order clarifies the current status of plaintiffs' four claims for relief. Plaintiffs' theory underlying their first, third, and fourth claims is that the 2013 Guidance constituted an unlawful "final agency action" under Section 706(2) (*e.g.*, Dkt. Nos. 90-1 at 16–25, 95 at 2–8). Plaintiffs' second claim for relief started out as a claim for "failure to act" under Section 706(1) (*see, e.g.*, Dkt. No. 81 at 4–5) but then evolved into claim under Section 706(2) instead. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (Section 706(1) provides relief for an agency's failure to act). Plaintiffs commit to this change in their opposition brief where they say their second claim for relief "should properly be regarded as a claim under § 706(2), *not § 706(1)*, despite Plaintiffs having cited both in their Complaint and in briefing" (Dkt. No. 95 at 9) (emphasis added).

In attempting to defuse various arguments leveled by the EPA and defendant-intervenors against their second claim for relief, plaintiffs repeatedly emphasize that they are *not* bringing any claim under Section 706(1) (Dkt. No. 103 at 7, 11–12). Plaintiffs' counsel also reaffirmed this position at oral argument. Thus, despite plaintiffs' repeated use of the phrase "failure to act," this order construes all four of plaintiffs' claims for relief as challenging, *under Section 706(2) only*, the 2013 Guidance's alleged promulgation of a new policy applying the "treated articles and substances" exemption to pesticide-treated seeds and their dust-off. This order first addresses plaintiffs' first, third, and fourth claims for relief within the framework of final agency

United States District Court

For the Northern District of California

1    action analysis, reserving for later the nettlesome question of whether plaintiffs' "failure to act"

2    claim can survive summary judgment.

3         **3.    FINAL AGENCY ACTION?**

4         The APA permits judicial review of "[a]gency action made reviewable by statute and

5    final agency action for which there is no other adequate remedy in a court."  5 U.S.C. 704.

6    Since plaintiffs seek review under the general provisions of the APA, they must challenge a

7    "final agency action."  *Ibid.*; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990); *Or. Nat.*

8    *Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).  An "agency action"

9    includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent

10   or denial thereof, or failure to act."  5 U.S.C. 551(13); *Norton*, *supra*, at 62.  Moreover, to be

11   final, an agency action must satisfy two conditions.  *First*, "the action must mark the

12   consummation of the agency's decisionmaking process — it must not be of a merely tentative or

13   interlocutory nature."  *Second*, "the action must be one by which rights or obligations have been

14   determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154,

15   177–78 (1997) (quotations omitted); *Fairbanks North Star Borough v. U.S. Army Corps of*

16   *Eng'rs.*, 543 F.3d 586, 591 (9th Cir. 2008).[1]

17        **A.    Agency Action.**

18        Having ruled out the possibility that plaintiffs claim a "failure to act" under

19   Section 706(1), the next step of the inquiry is to determine whether the challenged 2013

20   Guidance is "the whole or a part of an agency rule, order, license, sanction, relief, or the

21   equivalent or denial thereof" so as to constitute "agency action."  5 U.S.C. 551(13); *Norton*,

22   *supra*, at 62.  To repeat, the relevant passage from the Guidance reads in its entirety (Dkt.

23   No. 88-2 at 7–8):

24             Inspectors may also take into account any locations of treated seed
             planting when identifying locations of potential pesticide sources.
25             Note:  Treated seed (and any resulting dust-off from treated seed)

26   _____

27        [1]  In their complaint and opposition to defendants' motion to dismiss, plaintiffs had previously argued
     that FIFRA, 7 U.S.C. 136n(a), also authorizes judicial review (Dkt. Nos. 1 at 1–2, 57 at 24–25).  In their motion
     for summary judgment, defendants contend "a cause of action may exist under either the APA or another
28   judicial review provision, but not both" (Dkt. No. 88 at 10).  Plaintiffs' briefs on summary judgment do not
     revive their contention that 7 U.S.C. 136n(a) authorizes judicial review.

United States District Court
For the Northern District of California

> may be exempted from registration under FIFRA [pursuant to 40
> C.F.R. 152.25(a)] as a treated article and as such its planting is not
> considered a "pesticide use."  However, if the inspector suspects or
> has reason to believe a treated seed is subject to registration (*i.e.*,
> the seed is not in compliance with the treated article exemption),
> plantings of that treated seed may nonetheless be investigated.

The EPA characterizes this passage, and the 2013 Guidance as a whole, as "a set of non-binding recommendations for the use of federal, state, and tribal inspectors" rather than an agency action (Dkt. Nos. 88 at 11, 96 at 3, 100 at 5–6).  The plain language of the 2013 Guidance supports the EPA's position in three ways.

*First*, the key passage quoted above reads like a recommendation, not a mandate. The first sentence discusses what inspectors "may" take into account during investigations. The customary meaning of "may" is permissive.  *Sierra Club v. Johnson*, 614 F. Supp. 998, 1003 (N.D. Cal. July 23, 2008).  The "Note" about pesticide-treated seed states that both the seeds and resultant dust-off "*may* be exempted from registration under FIFRA," indicating that applicability of the "treated articles and substances" exemption is not a foregone conclusion but a mere possibility, *i.e.*, the exemption *may or may not apply*.  This interpretation fits with the rest of the passage, which sets forth a corresponding scenario for each possibility:  *If* the inspector finds pesticide-treated seed (and resultant dust-off) exempt, *then* "as [a treated article] its planting is not considered a 'pesticide use.'"  But *if* "the inspector suspects or has reason to believe a treated seed is subject to registration (*i.e.*, the seed is not in compliance with the treated article exemption), plantings of that treated seed may nonetheless be investigated."

Plaintiffs reply that this passage represents a "definitive statement" despite its permissive language because the phrase "its planting is not considered a 'pesticide use'" is "definitive" (Dkt. No. 95 at 4).  That phrase would be definitive if it were its own sentence, but it is not.  It is merely a fragment within a sentence.  Plaintiffs' interpretation would completely omit not only the surrounding permissive language in the rest of that sentence and the rest of the passage, but also the *two immediately preceding words*, namely, "*as such* its planting is not considered a 'pesticide use'" (emphasis added) — with "as such" meaning "as a treated article."  In other words, the planting of a seed is not considered a pesticide use *if* the seed is a treated article covered by the "treated articles or substances" exemption (*see* Dkt. No. 96 at 14–15).  This order

United States District Court

For the Northern District of California

declines to interpret a single incomplete phrase inconsistently with the plain meaning of the rest of the relevant passage.

Plaintiffs further reply that it would make "no sense" to interpret this passage as making permissive and conditional statements because "a treated seed that has resulting dust-off" can *never* qualify for the "treated articles or substances" exemption, since "'[r]esulting dust-off from treated seed' necessarily includes the pesticidal coating and necessarily has pesticidal effects that extend beyond the seed itself" (Dkt. Nos. 95 at 4, 103 at 14–15).  The premise is plaintiffs' interpretation of the 2003 Harmonization Document as applying the "treated articles or substances" exemption only to pesticide-treated seeds that cause no pesticidal effect beyond the seed itself.  This argument would carry some weight if the 2003 Harmonization Document had interpreted the exemption to be inapplicable whenever a pesticide-treated seed's pesticidal effect extends in *any* way beyond the seed itself.  The 2003 Harmonization Document, however, did not impose such a strict limitation.  That document set forth two conditions for exemption, the second of which is that "the treatment is for the protection of the article or substance itself" (Dkt. No. 88-3 at 1).

Plaintiffs point out that the 2003 Harmonization Document explained the second condition for exemption as follows:  "The term 'for the protection of the [seed] itself' means that the pesticidal protection imparted to the pesticide-treated seed does not extend beyond the seed itself to offer pesticidal benefits or value attributable to the treated seed" (*id.* at 2).  Plaintiffs read this sentence as rendering ineligible for exemption any "treated seed that has resulting dust-off" (Dkt. No. 103 at 14).  Again, plaintiffs gloss over informing context and fail to read the phrase as a whole, *i.e.*, "*the treatment is for* the protection of the article or substance itself" (emphasis added) — wherein the words "the treatment is for" contemplate the pesticidal treatment's intended purpose rather than its entire range of potential but unintended effects.  The plain meaning of these excerpts from the 2003 Harmonization Document, read together, is that the pesticidal treatment used on the seed must be for — *i.e.*, intended for — the protection of the seed itself as opposed to protection that extends beyond the seed to offer other pesticidal benefits or value.

United States District Court

For the Northern District of California

This interpretation is consistent with the 2003 Harmonization Document's use of the phrase "pesticidal *benefits or value*" — as opposed to, *e.g.*, "pesticidal *effects*" — and with the immediately following sentence, which states, "Unless claims of pesticidal benefit or value attributable to the treated seed and extending beyond the treated seed are made in conjunction with the distribution or sale of the treated seed within the U.S., the EPA will presume that the seed will have been treated 'for the protection of the seed itself'" (Dkt. No. 88-3 at 2). This sentence highlights the distinction contemplated by the 2003 Harmonization Document between exempt pesticide-treated seeds and non-exempt pesticide-treated seeds — the latter would be distributed or sold with "claims of pesticidal benefit or value attributable to the treated seed and extending beyond the treated seed," while the former would ostensibly be distributed or sold with claims of pesticidal benefit or value *only* for the seed itself. In other words, the focus of the second condition for exemption described in the 2003 Harmonization Document is on the pesticidal treatment's intended purpose rather than on all its potential effects.

Nothing in the plain language of the 2003 Harmonization Document strictly limits the "treated articles and substances" exemption to pesticide-treated seeds that can never cause a pesticidal effect beyond the seed itself. Plaintiffs' claim that "treated seed that has resulting dust-off *cannot be exempted*" (Dkt. No. 103 at 14) (emphasis in original) is thus unsupported and fails to rebut the EPA's position that, as described by the plain language of the 2013 Guidance, "[t]reated seed (and any resulting dust-off from treated seed)" may or may not be exempt from FIFRA registration requirements (*e.g.*, Dkt. No. 96 at 15). *See Sierra Club*, *supra*, at 1003 (customary meaning of "may" is permissive).

*Second*, the EPA's position that the 2013 Guidance is "a set of non-binding recommendations for the use of federal, state, and tribal inspectors" is consistent with its cover memorandum. The cover memorandum, addressed to FIFRA Compliance and Enforcement Managers by the Office of Compliance, described the 2013 Guidance as a "guidance for inspecting alleged cases of pesticide-related bee incidents." Moreover, the cover memorandum stated, "I *request* that you distribute this guidance to your state lead agencies and tribal pesticide programs and *encourage* you to discuss implementation of this guidance with them" (Dkt. No.

**United States District Court**
For the Northern District of California

88-2) (emphasis added). This sort of permissive language is consistent with the EPA's position, but inconsistent with plaintiffs' claim that the 2013 Guidance was a "rule" or equivalent thereof with the force of law (*e.g.*, Dkt. No. 103 at 13–15).

*Third*, the 2013 Guidance included an explicit disclaimer that stated in relevant part (Dkt. No. 88-2) (emphasis added):

> This guidance is an *inspection support tool* provided by the U.S. Environmental Protection Agency (EPA), for use by EPA regions, states and tribes conducting inspections under [FIFRA]. This guidance represents EPA's *recommended* procedures for these inspectors when they are conducting FIFRA inspections as a result of an incident involving bee deaths. *This guidance is not a regulation and, therefore, does not add, eliminate or change any existing regulatory requirements. The statements in this document are intended solely as guidance.* This document is not intended, nor can it be relied on, to create any rights enforceable by any party in litigation with the United States. EPA, state and tribal officials may decide to follow the guidance provided in this document, *or to act at variance with the guidance*, based on analysis of site-specific circumstances. This guidance may be revised without public notice to reflect changes in EPA's policy.

Plaintiffs offer two responses to this disclaimer. The first is that the disclaimer is "boilerplate" language, and the Court is not obliged to accept it at face value (Dkt. No. 90-1 at 23). As this order explains, however, the disclaimer — boilerplate or not — is consistent with the EPA's position and with the rest of the 2013 Guidance. Plaintiffs are correct that the disclaimer is not *dispositive* of the true nature of the 2013 Guidance, but that does not mean the disclaimer is not *relevant*.

In their reply brief, plaintiffs raise a second argument against the disclaimer, claiming it is "directly contradict[ed]" by the following page in the 2013 Guidance (Dkt. No. 103 at 3–4). That page stated in relevant part (Dkt. No. 88-2 at 1): "This guidance will aid in standardizing bee incident inspections across federal, state and tribal agencies when trying to determine if the deaths are related to the use of a pesticide in violation of FIFRA. The data gathered in these types of inspections will help determine if the death of the bees was associated with the legal or illegal use of a pesticide." Plaintiffs point out that if "the purpose of the 2013 Guidance is to help determine whether the particular use of a pesticide was legal or illegal under FIFRA," then it also helps determine "whether EPA should take enforcement action or not." Thus, plaintiffs

argue, this language "reveal[ed] the true purpose of the document to be something much more substantive" than the disclaimer would suggest (Dkt. No. 103 at 3–4).

It does not follow that the disclaimer is "directly contradict[ed]" by the language quoted above.  A disclaimer that essentially states the 2013 Guidance is non-binding does not contradict an acknowledgment that it will nonetheless be *helpful* to inspectors in conducting investigations and making determinations that may lead to discrete agency action.  Moreover, plaintiffs' reasoning would lead to the untenable conclusion that virtually any guidance — no matter how non-binding or advisory — could be subject to judicial review on the vague theory that it informs some day-to-day activity that may somehow affect discrete agency action somewhere down the line.  At best, plaintiffs possibly have shown a speculative degree of tension between the EPA's characterization of the 2013 Guidance's overall significance and the practical reality of its influence on the EPA's FIFRA enforcement efforts — but this falls well short of a direct contradiction that would completely discredit the disclaimer.

In summary, considering together the disclaimer, cover memorandum, and key passage that is the subject of plaintiffs' challenge, this order concludes the plain language of the 2013 Guidance supports the EPA's position that it was not an agency action.

Plaintiffs attempt to discredit the EPA's position by pointing out that "[a] reviewing court does not have to rubber stamp an agency's own characterization of its action (Dkt. No. 90-1 at 17).  The foregoing analysis, however, is not a rubber stamp.

Plaintiffs cite *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003), for the proposition that "the agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise." *CropLife*, however, is distinguishable from this case.  In *CropLife*, the EPA issued a press release stating "the Agency will not consider or rely on [third-party] human studies in its regulatory decision making, whether previously or newly submitted." *CropLife*, *supra*, at 878.  The EPA claimed the statement was "nothing more than a 'policy statement,' and thus [was] not subject to judicial review."  The reviewing court rejected the EPA's self-serving characterization of its own action as "not controlling" because "there [was] little

United States District Court

For the Northern District of California

doubt that the . . . Press Release [bound] private parties and the agency itself with the force of law, and thus constitute[d] a regulation rather than a policy statement.  The directive clearly establishe[d] a substantive rule declaring that third-party human studies [were] deemed immaterial in EPA regulatory decisionmaking." *Id.* at 883.  In other words, in *CropLife* the record clearly contradicted the agency's characterization of its own action.

No comparable facts present in this case.  Here, as discussed above, the plain language of the 2013 Guidance supports the EPA's position that it is "a set of non-binding recommendations for the use of federal, state, and tribal inspectors" (Dkt. Nos. 88 at 11, 96 at 3, 100 at 5–6), not a rule with the force of law.

Plaintiffs also cite *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 553–54 (9th Cir. 2009), as an example of when "[t]he Ninth Circuit has found that statements within memoranda are final agency actions actionable under the APA."  *Siskiyou* is also distinguishable from this case.  In *Siskiyou*, the agency memorandum at issue interpreted "*binding* standards and guidelines [restricting] certain activities within areas designated as riparian reserves or key watersheds."  *Siskiyou*, *supra*, at 551–53.  The jurisdictional question addressed by the court was whether the lawsuit constituted an improper "programmatic attack."  The court found the plaintiff's allegations challenged "specific instances of the [agency's] actions taken pursuant to its interpretation of [the memorandum], and therefore constitute[d] more than a programmatic attack or a vague reference to [agency] action or inaction."  *Id.* at 554.  There was no dispute as to whether the memorandum was a non-binding recommendation or a binding document with the force of law.  *Siskiyou* is thus unhelpful to plaintiffs' position that mere issuance of a non-binding guidance is agency action for purposes of APA review.

Plaintiffs further contend the 2013 Guidance is an agency action because it effectively amended the "treated articles or substances" exemption as interpreted by the 2003 Harmonization Document (Dkt. No. 103 at 13).  Specifically, plaintiffs claim the 2013 Guidance (1) "expand[ed] the . . . exemption from seeds to dust-off," (2) "stat[ed] definitively that the planting of treated seeds and dust-off is not considered a pesticide use," and (3) omitted the condition that "the pesticidal protection imparted to the treated seed does not extend beyond the

seed itself to offer pesticidal benefits or value attributable to the treated seed" (*e.g.*, Dkt. Nos. 90-1 at 13–14, 95 at 4–5, 103 at 14).  Plaintiffs cite *Hemp Indus. Ass'n v. D.E.A.*, 333 F.3d 1082, 1087 (9th Cir. 2003), as the "key Ninth Circuit precedent" (Dkt. No. 103 at 13) for the proposition that an agency guidance has the "force of law" when it "effectively amends a prior legislative rule."

It is important to note that *Hemp* is distinguishable from this case because the challenged agency in *Hemp* had actually issued a *rule* banning naturally occurring THC.  *Hemp*, *supra*, at 1084.  The issue before that court was whether that rule was "legislative," in which case the agency needed to follow certain procedures described in the APA, or "interpretive," in which case the agency did not.  Within that context, the court concluded "a rule has the 'force of law' [*i.e.*, is legislative] . . . when [it] effectively amends a prior legislative rule."  *Id.* at 1087.

Here, in contrast, the challenged 2013 Guidance was not a rule (*see* Dkt. No. 100 at 5). A "rule," as defined by the APA, is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. 551(4).  Here, as discussed above, the 2013 Guidance did not "implement, interpret, or prescribe law or policy," nor did it describe any *requirements* of the EPA, since it comprised of recommendations with which compliance is permissive, not mandatory.  There is thus no reason to conclude the 2013 Guidance was a "rule" — or rule "equivalent," as plaintiffs suggest (Dkt. No. 1 at 23) — of the sort contemplated by *Hemp*.

Plaintiffs attempt to overcome this distinction by claiming "an agency's interpretive rule or statement of policy can be a reviewable 'rule' within the meaning of the APA," citing *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1021 (D.C. Cir. 2000), which stated:

> If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

Plaintiffs provide no analysis as to why *Appalachian Power* applies in this case (Dkt. No. 90-1 at 19). Their bald statement that "an agency's interpretive rule or statement of policy *can* be a reviewable 'rule' within the meaning of the APA" (emphasis added) does not demonstrate that such is the situation here. As discussed above, the EPA did not act as if the 2013 Guidance was controlling in the field or a "legislative rule." In fact, an explicit disclaimer in the 2013 Guidance and the plain language of the document itself indicated otherwise. The EPA may base enforcement actions on the results of investigations conducted according to the 2013 Guidance, but nothing in the record indicates the EPA has taken discrete enforcement actions based directly on the 2013 Guidance itself. Finally, as discussed above, the 2013 Guidance would not lead its recipients to believe the EPA will "declare permits invalid," or take any action, "unless they comply with the terms of the document." In fact, the cover memorandum, disclaimer, and plain language of the 2013 Guidance all indicated compliance was voluntary because the document offered a set of recommendations, not rules or mandates. *Appalachian Power* is thus unhelpful to show that the 2013 Guidance "is for all practical purposes 'binding.'"

Even assuming for the sake of argument that *Hemp*'s reasoning applies, not only to actual rules issued by an agency, but also to non-binding guidance documents, *Hemp* would still not support plaintiffs' position. As discussed above, the 2013 Guidance did not amend the "treated articles or substances" exemption as interpreted by the 2003 Harmonization Document. The 2013 Guidance did not contradict the 2003 Harmonization Document, nor did the passage plaintiffs rely on definitively direct mandatory application or withholding of the "treated articles or substances" exemption.

### B.    Finality.

The 2013 Guidance, moreover, lacked the finality required for judicial review under the APA. To be "final" for purposes of the APA, an action must (1) "mark the 'consummation' of the agency's decisionmaking process," *i.e.*, "it must not be of a merely tentative or interlocutory nature," and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, *supra*, at 177–78 (citations omitted). Neither requirement is satisfied here.

*First*, the 2013 Guidance did not mark the "consummation" of the EPA's decisionmaking process with respect to applying the "treated articles or substances" exemption to pesticide-treated seeds.  As explained, the 2013 Guidance recommended that inspectors investigating bee deaths consider *if* the exemption should apply on a case-by-case basis.  It did not mandate the investigations, much less direct their outcomes.  Insofar as the resulting determinations from these investigations potentially influence the EPA's enforcement decisions further down the line, they are necessarily "tentative" or "interlocutory" in nature.  Thus, the 2013 Guidance, which merely assisted investigations that are themselves only "tentative" or "interlocutory," could not be the "consummation" of the EPA's decisionmaking process.

*Second*, and for similar reasons, the 2013 Guidance could not have been an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  Based on the 2013 Guidance alone it would be impossible to determine if a particular investigator would conclude a particular pesticide-treated seed qualifies for the "treated articles or substances" exemption, if the seed would therefore be subject to FIFRA's registration requirements, or if the EPA would take further enforcement action.  Thus the 2013 Guidance — the alleged agency action in this case — was not a final agency action that determined rights or obligations, or triggered legal consequences.

Plaintiffs' other arguments that the 2013 Guidance was sufficiently final for purposes of APA review are similarly unpersuasive.  *First*, plaintiffs claim the 2013 Guidance "represents the final word by EPA on its decision to exempt neonicotinoid-coated seeds and pesticidal dust-off from the requirements of FIFRA" (Dkt. No. 90-1 at 19).  Thus, plaintiffs contend, the legal consequence flows that "planting of treated seeds and any resulting dust-off are not considered pesticidal uses under FIFRA" (*id.* at 21–22).  But as stated, the 2013 Guidance conveyed no such decision.  Contrary to plaintiffs' bald assertions that "sellers and users of . . . treated seed with associated pesticidal dust-off . . . do not have to comply with [FIFRA]," and that the "EPA does not and will not enforce FIFRA against the sale or use of neonicotinoid-coated seeds" (*id.* at 19–20), the 2013 Guidance expressly contemplated scenarios in which pesticide-treated seeds could be subject to FIFRA's registration requirements and necessitate enforcement (Dkt.

United States District Court
For the Northern District of California

1    No. 88-2 at 7).  The 2013 Guidance thus did not represent the EPA's "final word" as to any

2    non-enforcement policy.

3        *Second*, plaintiffs claim the 2013 Guidance "is clearly the consummation of EPA's

4    decisionmaking process" because "it is explicitly 'a supplement to the national [FIFRA]

5    Inspection Manual,' . . . which is described as 'an important element of the [EPA's] Pollinator

6    Protection Strategic Plan.'"  Plaintiffs also point out the 2013 Guidance "is not a draft or

7    preliminary document, but rather a final document published by the agency" (Dkt. No. 90-1

8    at 20).  These are non sequiturs.  A "supplement" to an inspection manual is not necessarily a

9    "consummation" of the decisionmaking process aided by that manual.  An "important element"

10   of the EPA's plan to protect pollinators is not necessarily a "consummation" of its

11   decisionmaking process as to a specific exemption relevant to that plan.  And it would be absurd

12   to conclude that a document is "final" for purposes of judicial review under the APA just

13   because it is a final published document, as opposed to a preliminary draft.  It is the document's

14   nature, not the stage of its drafting, that is germane to the finality inquiry.[2]

15       **4.    FAILURE TO ACT?**

16       As discussed, plaintiffs' second claim for relief is essentially a "failure to act" claim now

17   brought under Section 706(2) instead of Section 706(1).  At oral argument, plaintiffs focused

18   solely on this claim, insisting they never abandoned their "failure to act" allegations and glossing

19   over their previous flip-flopping from Section 706(1) to Section 706(2).  Plaintiffs now stake

20   their second claim for relief on an "exception" articulated in a footnote in *Heckler v. Chaney*,

21   470 U.S. 821 (1985).

22       **A.    *Heckler* Exception.**

23       At oral argument, plaintiffs repeatedly emphasized that the "*Heckler* exception"

24   authorizes judicial review of their second claim for relief.  This begs the question:  Exception to

25

26       [2] Plaintiffs also claim the 2013 Guidance "represents EPA's last word for the purposes of the *Bennett*
     test even though the agency *could* take some other action in the future" (Dkt. No. 90-1 at 20) (emphasis in
27   original), ostensibly attempting to preempt an argument by the EPA that the 2013 Guidance lacked finality
     because the agency could take future action on the guidance's subject matter.  Since neither the EPA nor this
28   order relies on the possibility of future agency action in concluding the 2013 Guidance lacked finality,
     plaintiffs' point does not affect the analysis herein.

what?  To answer this question, it is necessary to take a step back and clarify the context and holding of *Heckler*.

As stated, judicial review of claims like the ones in this case requires a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. 704.  Where there is no such final agency action, judicial review is not available and the inquiry ends.  *If* final agency action exists, however, then such action is nonetheless unreviewable unless it *also* clears the hurdle imposed by Section 701(a)(2), *i.e.*, that it is not agency action "committed to agency discretion by law."  *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 & n.7, 246–47 (1980); *Aguayo v. Jewell*, 827 F.3d 1213, 1223 (9th Cir. 2016).  In other words, Section 701 functions *in addition to*, but does not *replace*, Section 704.  This is evident both in the case law applying these provisions and in the plain language of Section 701(a), which states, "This chapter applies, *according to the provisions thereof*, except to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  The *Heckler* decision, applying Section 701(a)(2), held that in situations where an agency "refus[es] to take enforcement steps . . . the presumption is that judicial review is not available" because "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion."  *Heckler*, *supra*, at 831–33.  In short, an agency's refusal to take enforcement action is generally unreviewable under Section 701(a)(2).  The exception to this general rule — *i.e.*, the "*Heckler* exception" plaintiffs rely on — is in a footnote to the aforementioned analysis, wherein *Heckler* stated the Court "express[ed] no opinion" on whether an agency's decision to "consciously and expressly adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities" would similarly be "unreviewable under § 701(a)(2)."  *Id.* at 833 & n.4 (quotations omitted).

That expression of "no opinion" left open the possibility that "[a] decision that is committed to agency discretion by law may nonetheless be reviewable where the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."  *Garcia v. McCarthy*, 649 F. App'x 589, 592 (9th

17

1   Cir. 2016) (quotations omitted).  Plaintiffs' application of this exception to their second claim for

2   relief, however, suffers from two fatal flaws.

3   　　　*First*, application of the *Heckler* exception requires an agency decision to "consciously

4   and expressly" adopt a general policy.  Plaintiffs claim the "EPA's failure to enforce FIFRA

5   against neonicotinoid-coated seeds and pesticidal dust-off is a 'consciously and expressly

6   adopted general policy,' which 'amounts to an abdication of [the EPA's] statutory

7   responsibilities,'" but this is mere recitation of the *Heckler* exception coupled with a bald

8   assertion that it is on point in this case.  Plaintiffs have not identified a single document that

9   contains such a decision.  The administrative record and the Court's *in camera* review of

10   additional documents submitted by the EPA also revealed nothing that would qualify as a

11   decision "consciously and expressly" adopting any general policy, much less one "so extreme

12   as to amount to an abdication of [the EPA's] statutory responsibilities."  The bulk of those

13   documents included multiple drafts, often attached to multiple email chains, of the 2013

14   Guidance as its contents were repeatedly and painstakingly discussed, reviewed, and edited

15   in the long road to publication.

16   　　　In their reply brief, plaintiffs argue judicial review is available for the EPA's "policy of

17   non-enforcement [as to pesticide-treated seeds] . . . expressed in [the] EPA's 2013 Guidance"

18   (Dkt. No. 103 at 8).  This argument is unavailing.  As stated, the 2013 Guidance — which

19   plaintiffs characterize as the "focal point" that "expressed" the alleged policy — contained no

20   language indicating the EPA took a definitive stand on the applicability of the "treated articles

21   or substances" exemption to any pesticide-treated seeds.  Indeed, the very fact that the relevant

22   passage acknowledged two possibilities — either pesticide-treated seed qualifies for the

23   exemption or it does not — indicated the EPA had no standing policy on the matter.

24   　　　To this end, the 2013 Guidance specifically informed investigators "plantings of . . .

25   treated seed may . . . be investigated" if the pesticide-treated seed "is subject to registration

26   (*i.e.*, the seed is not in compliance with the treated article exemption)" (Dkt. No. 88-2 at 7).

27   This language indicated that the EPA in issuing the 2013 Guidance expressly contemplated

28   *potential enforcement* of FIFRA requirements as to pesticide-treated seeds, which directly

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

contradicts plaintiffs' allegations of a "policy of non-enforcement" and "abdication of duties."
Thus, even assuming for the sake of argument that a blanket-exemption policy as to
pesticide-treated seeds would constitute an abdication of the EPA's responsibilities under
FIFRA as to such seeds, there is no basis for finding the EPA "consciously and expressly
adopted a general policy" abdicating its statutory responsibilities here.

*Second*, plaintiffs' framing of their second claim for relief within the *Heckler* exception
is predicated on flagrant mischaracterization of how the exception functions. At oral argument,
plaintiffs' counsel repeatedly stated the *Heckler* exception dispenses with the APA's final
agency action requirement for judicial review. That was and remains wrong. Plaintiffs could
properly raise the *Heckler* exception to defend their second claim for relief *if* they had first
alleged a final agency action that defendants had argued was nonetheless unreviewable because
of the hurdle imposed by Section 701(a)(2). As explained, however, plaintiffs cannot even clear
the initial Section 704 hurdle of identifying a final agency action. Thus, their claim cannot reach
the additional requirements of Section 701(a)(2), let alone raise *Heckler* as a defense against said
requirements. In short, the *Heckler* exception might save plaintiffs' claim from Section
701(a)(2) but does nothing to circumvent Section 704.[3]

What plaintiffs need here is not an exception to Section 701(a)(2), but an exception to
the "final agency requirement" of Section 704. Such an exception exists — in Section 706(1).
"A court's review of an agency's failure to act [under Section 706(1)] has been referred to as
an exception to the final agency action requirement." *ONRC Action v. Bureau of Land Mgmt.*,
150 F.3d 1132, 1137 (9th Cir. 1998); *Indep. Min. Co., Inc. v. Babbitt*, 105 F.3d 502, 511 (9th Cir.
1997). Plaintiffs, however, have unequivocally foresworn any reliance on Section 706(1)
(*e.g.*, Dkt. No. 95 at 9). The final agency action requirement for judicial review under the APA
thus applies squarely to their second claim for relief under Section 706(2). As stated, plaintiffs

---

[3] Plaintiffs' briefing indicates they understood how to apply *Heckler* correctly, *i.e.*, to rebut the EPA's
argument that any alleged decision to not enforce FIFRA would generally be unreviewable pursuant to Section
701(a)(2) as a decision committed to agency discretion (*see* Dkt. Nos. 95 at 8–13, 103 at 8). If so, plaintiffs'
representation at oral argument that they relied on *Heckler* all along as an exception to the "final agency action"
requirement of Section 704 was disingenuous.

1    cannot meet this requirement.  Thus, their second claim for relief — like their first, third, and

2    fourth claims — is unreviewable under the APA.

3                    **B.    Administrative Record.**

4           Finally, this order must address the parties' fight over the administrative record.

5    Plaintiffs had previously moved to compel "completion and supplementation" of the

6    administrative record, and to conduct limited discovery in support of their second claim for

7    relief (Dkt. No. 81).  A prior order instructed the EPA to submit under seal for *in camera*

8    review "documents that relate to the development of the guidance that are *not* a part of the

9    administrative record, including pre-decisional and deliberative documents," instructed plaintiffs

10   to "lay out any alleged shortfalls in the administrative record" in their summary judgment briefs,

11   and denied plaintiffs' request for limited discovery without prejudice (Dkt. No. 86).  Plaintiffs

12   now renew their request for limited discovery relevant to their second claim for relief (Dkt.

13   No. 90-1 at 11).  The original basis for this request was that, unlike plaintiffs' other claims for

14   relief, a claim for failure to act under Section 706(1) is not predicated on an agency action for

15   which there can be a clearly demarcated administrative record.  Thus, plaintiffs argued, they

16   should be allowed to take extra-record discovery (Dkt. No. 81 at 4–5).  As stated, plaintiffs have

17   since abandoned their claim under Section 706(1) and are proceeding on the theory that all four

18   claims for relief challenge a final agency action under Section 706(2).  The premise of their

19   request for limited discovery is now defunct (*see* Dkt. No. 100 at 8 & n.4).  Accordingly, the

20   request is **DENIED**.

21          Plaintiffs also renew their request to compel the EPA to supplement the administrative

22   record with additional materials.  The prior order directing the EPA to lodge the administrative

23   record stated, "The administrative record shall include all emails and memoranda discussing

24   whether the agency should proceed by guidance versus some other procedure and/or discussing

25   whether the guidance would constitute final agency action" (Dkt. No. 62 at 8–9).  In claiming the

26   EPA has failed to comply with that order, plaintiffs highlight the importance of three documents:

27   (1) "Pros and Cons of Issues Surrounding Review and Release of the Guidance," (2) an email

28

1  from the Chief Division of Plant Health, Ohio Department of Agriculture, and (3) a PowerPoint

2  presentation titled "2012 Indiana Bee Kill Investigations" (Dkt. No. 90-1 at 14–15).

3      The Court's *in camera* review of these unredacted documents, and others submitted by

4  the EPA, revealed nothing that would weigh in plaintiffs' favor on the issue of "whether the

5  agency should proceed by guidance versus some other procedure" or "whether the guidance

6  would constitute final agency action."  Nor did any document submitted for *in camera* review

7  support application of the *Heckler* exception to this case.  There is thus no reason to compel

8  additional production.  Plaintiffs also seek documents that would be relevant to the *merits* of

9  their claims (*e.g.*, *id.* at 16; Dkt. No. 103 at 1–2) but, as discussed, have not satisfied the

10 requirements for judicial review under the APA.  Their request to supplement the administrative

11 record is therefore **DENIED**.

12                    **CONCLUSION**

13     The Court is most sympathetic to the plight of our bee population and beekeepers.

14 Perhaps the EPA should have done more to protect them, but such policy decisions are for the

15 agency to make.  A district judge's role is limited to judicial review of final agency actions,

16 which do not include the type of guidance involved here.

17     For the foregoing reasons, defendants' motion for summary judgment, in which

18 defendant-intervenors join, is **GRANTED**.  Defendant-intervenors' separate motion for summary

19 judgment is **DENIED AS MOOT**.  Plaintiffs' motion for summary judgment is **DENIED**.

20 Plaintiffs' request for judicial notice (Dkt. No. 93) of documents not relied upon in this order

21 is **DENIED AS MOOT**.

22

23     **IT IS SO ORDERED.**

24

25 Dated:  November 21, 2016.                    _____

26                                              WILLIAM ALSUP
                                                UNITED STATES DISTRICT JUDGE

27

28

21